## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

_____ )
**UNITED STATES SECURITIES** )
**AND EXCHANGE COMMISSION,** )   **Case No.**
                                                          )
            **Plaintiff,** )   **Judge:**
                                                          )
                            **v.** )   **Magistrate Judge:**
                                                          )
**ANDREW J. KANDALEPAS,** )
                                                          )
            **Defendant.** )   **Jury Trial Demanded**
                                                          )
_____ )

## <u>COMPLAINT</u>

Plaintiff, the United States Securities and Exchange Commission (the "SEC"), alleges as follows:

### <u>Nature Of The Case</u>

1.      This case involves a fraudulent scheme to misappropriate corporate funds, defraud investors, and manipulate the stock of Wellness Center USA, Inc. ("Wellness") by Andrew J. Kandalepas ("Kandalepas"), who is the Chief Executive Officer and Chairman of the Board of Directors of Wellness. Kandalepas was also the President of Wellness until December 2017 and Chief Financial Officer until February 2018.

2.      From 2012 through 2015, Kandalepas (1) misappropriated $450,000 from Wellness and then fraudulently characterized the withdrawals as "salary," "prepayments," or "loans" to conceal the misappropriation; (2) pocketed over $136,000 of trading profits by surreptitiously trading hundreds-of-thousands of shares of Wellness stock in his friend's online brokerage

account; and (3) manipulated the market for Wellness stock by entering trades to mark-the-close, by buying and selling Wellness shares for the purpose of increasing trading volume and stabilizing the share price, and by directing friends and business associates to do the same.

3.      Wellness and Kandalepas also defrauded investors and potential investors through a series of false and misleading statements. Throughout fiscal year 2013, Wellness filed Forms 10-K and 10-Q signed by Kandalepas that misrepresented Kandalepas' compensation and failed to disclose his misappropriation of funds. In 2015, Wellness also issued press releases approved by Kandalepas that misleadingly suggested that Wellness was selling medical devices when Kandalepas knew or was reckless in not knowing that FDA regulations prohibited Wellness from distributing or selling the devices.

4.      Additionally, at various times during 2012 through 2017, Wellness, through Kandalepas, retained an unregistered broker-dealer to identify and introduce Wellness to potential investors and funding sources.

**Jurisdiction And Venue**

5.      The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("the Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("the Exchange Act") [15 U.S.C. § 78u(d)]. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa].

6.      Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa] because the Defendant resides in this District and the acts, practices, and courses of business constituting the violations alleged in this Complaint have occurred within this District and elsewhere.

**Defendant**

7.     **Andrew J. Kandalepas.**  Kandalepas has been the Chief Executive Officer and Chairman of the Board of Directors of Wellness since its inception in 2010.  Kandalepas was also the President of Wellness until December 2017 and the Chief Financial Officer until February 2018.  Kandalepas, who is 66, resides in Schaumburg, Illinois.

**Other Relevant Entity And Individual**

8.     **Wellness Center USA, Inc.**  Wellness is a Nevada corporation formed in June 2010 with its principal place of business in Hoffman Estates, Illinois.  Since March 2012, Wellness' common stock has been quoted on the Over-the-Counter Bulletin Board under the symbol WCUI.  Since October 1, 2014, Wellness has had reporting obligations under Section 15(d) of the Exchange Act [15 U.S.C. § 78o].

9.     **Matthew T. Mushlin ("Mushlin").**  From 2013 through 2017, Mushlin raised over two million dollars in capital for Wellness by soliciting over 30 investors who purchased Wellness stock through private placements.   He participated in multiple offerings of Wellness stock since 2012.  From 1993 to 2001, Mushlin was a registered representative associated with broker-dealers registered with the Commission.  He is the managing member of Equinox One Consulting, LLC ("Equinox"), a Florida limited liability company that purportedly helps companies identify capital and business opportunities.  Mushlin, age 49, resides in Fort Lauderdale, Florida.

**Facts**

A.     **Wellness Was Controlled by Kandalepas**

10.     In June 2010, Wellness was formed as an online nutritional supplements marketer and distributor.

11.     Through a series of acquisitions, Wellness is currently the holding company of two subsidiaries involved in the healthcare sector.  A third subsidiary was sold in 2017.

12.     Since the formation of Wellness in 2010, Kandalepas has unilaterally controlled all of Wellness' functions and operations.  He appointed himself as Chief Executive Officer, Chief Financial Officer, and President.

13.     Kandalepas was the sole officer of Wellness from its inception until December 2017.

14.     Kandalepas also appointed himself to serve as Chairman of Wellness' Board of Directors.

15.     Wellness' fiscal year ends September 30.

16.     Wellness' operations, including the payment of compensation to Kandalepas, are primarily funded through sales of common stock and the exercise of warrants.  The sales of stock and the exercise of warrants have raised approximately $19.159 million since 2011.

17.     Wellness has received a "going concern" opinion from its auditors and has operated at a loss in each year since 2011, with an accumulated deficit of $19.1 million through September 30, 2017.

18.     Since 2011, auditors have repeatedly concluded that Wellness has material weaknesses in its internal control over financial reporting.  Some of those weaknesses include lack of sufficient financial expertise, lack of an independent board of directors, and insufficient segregation of duties within its accounting functions.

19.     During the seven years he was the sole officer of Wellness, Kandalepas was responsible for Wellness' financial reporting, including the issuance of periodic reports filed with the SEC.  Kandalepas also had sole control over Wellness' bank accounts and its bookkeeping.

20. During the relevant time, Wellness' board of directors had no audit committee and no independent director with financial expertise. This was ineffective oversight of Wellness' financial reporting.

**B.** **Kandalepas Took Unauthorized Withdrawals From Wellness and Concealed His Conduct**

21. From 2010 to early 2012, Kandalepas loaned Wellness approximately $100,000 to $200,000 to help fund its operations. By the end of fiscal year 2012, Kandalepas had repaid himself these loans by, at his own discretion, taking withdrawals from Wellness' bank account. After repayment, Kandalepas continued to withdraw money from Wellness' bank account.

22. In February 2013, Wellness' bookkeeper notified Kandalepas that during the first quarter of fiscal year 2013 he had taken out $68,433 beyond what he had loaned to Wellness.

23. Kandalepas then unilaterally and retroactively declared he would receive a $200,000 annual salary to justify his withdrawals. Kandalepas took this action without consultation with or authorization from Wellness' Board of Directors. Wellness' bylaws required the Board to authorize all officer compensation.

24. Kandalepas and Wellness did not enter into an employment agreement memorializing his new salary. Kandalepas has never had an employment agreement with Wellness.

25. Wellness failed to disclose that Kandalepas started receiving a salary in 2013. Instead, Wellness' first and second quarter 2013 Forms 10-Q falsely stated that "Kandalepas has elected not to receive any compensation for his services, until the Company is financially capable to compensate him." In fact, Kandalepas had taken $100,000 in "salary" over these two quarters.

26. During this period, Kandalepas also made oral representations to investors and potential investors that he was not receiving a salary.

27.     In first and second quarter 2013, Wellness' consolidating income statements in its Forms 10-Q included a line-item reporting "salaries-officers" of $50,000 and $100,000 respectively, but did not attribute this salary to Kandalepas.  To the contrary, the only affirmative disclosure about Kandalepas' compensation claimed he was not receiving any.

28.     Throughout 2013, Kandalepas took whatever funds he wanted from Wellness whenever he pleased.  Kandalepas took frequent withdrawals of inconsistent amounts rather than regular salary payments.  Furthermore, Kandalepas did not limit the amount of his withdrawals to his new "salary."

29.     By the end of fiscal year 2013, Kandalepas had taken over $457,000 from Wellness: $200,000 in the form of salary and $257,085 in excess withdrawals.  Wellness had not been accruing a salary for him prior to 2013.

30.     Wellness concealed Kandalepas' excess withdrawals in its 2013 periodic reports filed with the SEC.  Each quarter during 2013, Wellness recorded $50,000 for "salaries-officers," and booked any excess withdrawals over $50,000 as prepaid expenses.

31.     In each of Wellness' 2013 Forms 10-Q, Wellness buried Kandalepas' excess withdrawals in a balance sheet line item entitled "prepayments and other current assets."  There was no disclosure that this line item represented withdrawals of corporate funds by Kandalepas. These disclosures were false and misleading, as they failed to disclose Kandalepas' withdrawals from Wellness and treated Kandalepas' withdrawals as prepayments when Kandalepas considered them as additional compensation for previous years' service.

32.     Kandalepas signed each of the 2013 Forms 10-Q on behalf of Wellness.

33.     In January 2014, when the Wellness fiscal year 2013 audit was being performed, Wellness' auditor spoke with Kandalepas about the $257,085 that Kandalepas had withdrawn from Wellness above his salary throughout 2013.

34.     Kandalepas told Wellness' auditor that he considered his unauthorized withdrawals to be "back pay" for previous years' service for which he was not compensated.

35.     Wellness' auditor advised Kandalepas that he could not take "back pay" since Wellness had not accrued salary for him in prior periods, and therefore the excess withdrawals would need to be recognized as compensation in 2013 or Kandalepas would need to pay back the money, either immediately or pursuant to a promissory note.

36.     Kandalepas did not want to recognize the $257,085 as additional compensation because he did not want to create a negative perception for shareholders that he took over $450,000 in compensation for 2013.

37.     Instead, between midnight and 3:00 a.m. on January 14, 2014, the same day that Wellness' 2013 Form 10-K was signed, Kandalepas executed a promissory note agreeing to repay Wellness $250,000 plus interest ("Promissory Note").  The repayments were to be made between April 2014 and July 2015.

38.     Although executed on January 14, 2014, the Promissory Note was backdated to September 30, 2013, the last day of Wellness' 2013 fiscal year.

39.     The excess withdrawals were reclassified on Wellness' balance sheet from prepaid expenses to a note receivable.

40.     Wellness' 2013 Form 10-K made several false representations concerning the Promissory Note:

    a.   In Item 13, *Certain Relationships and Related Transactions, and Director Independence*, Wellness falsely stated that "[o]n September 30, 2013, Mr. Kandalepas borrowed $250,000 from the Company pursuant to a promissory note." In fact, Kandalepas did not borrow any money from Wellness on September 30, 2013. Throughout fiscal year 2013, Kandalepas made dozens of withdrawals totaling $257,085 with the intention of keeping those funds.

    b.   In Note 10 of the financial statements, *Related Party Transactions*, Wellness stated that "[o]n September 30, 2013, Chairman, President, and CEO ("Maker") hereby promises to pay [$250,000] to the order of Wellness Center." However, this promise, *i.e.*, the execution of the note, occurred on January 14, 2014 – the day the Form 10-K was filed – not on September 30, 2013.

    c.   The Promissory Note was executed more than three months after the end of the fiscal year. The 2013 Form 10-K did not disclose the execution of the Promissory Note as a Subsequent Event.

41.    The 2013 Form 10-K attached a copy of the falsely dated Promissory Note as an exhibit.

42.    The disclosures in the 2013 Form 10-K were false and misleading. The Promissory Note was used to cover up the fact that Kandalepas had taken hundreds-of-thousands of dollars from Wellness without authorization.

43.    Kandalepas did not have the intention or the financial ability to repay the Promissory Note.

44.    Kandalepas' quarterly obligation under the Promissory Note was nearly equal to his gross quarterly salary. In addition, at the time he executed the Promissory Note, Kandalepas was

delinquent on his mortgage, had thousands of dollars of credit card debt, and had virtually no cash in his accounts from which he could make payment.

45.     Kandalepas was nearly two months late in making his first payment which was due in April 2014.  Even then, he paid only $10,000 of the more than $40,000 that was due.

46.     By December 2014, Kandalepas was delinquent on the Promissory Note by at least $110,000.

47.     In early 2016, Wellness wrote off the nearly $200,000 that Kandalepas still owed under the Promissory Note.  It was written off as compensation to Kandalepas.

48.     Throughout the period where Wellness had false and misleading Forms 10-K and 10-Q filed with the SEC, including 2013 through 2015, Wellness conducted offerings of its common stock through private placements.

**C.     Kandalepas Surreptitiously Traded Wellness Stock in His Best Friend's Brokerage Account**

49.     Kandalepas also used his position and control over Wellness to improperly gain approximately $136,000 in trading profits.

50.     At Wellness' inception in 2010, Wellness issued more than 3.6 million shares of common stock to Kandalepas and options to purchase another 1.6 million shares.  Kandalepas also caused Wellness to issue over 11 million shares to members of Kandalepas' family, close friends, and business associates at the price of $0.001 per share.  This included 740,000 shares to Kandalepas' best friend.

51.     Kandalepas frequently told investors and prospective investors that he never sold any of the Wellness shares he obtained when the company was formed.  He made these statements, in addition to statements about how he did not take a salary, to impress upon investors his loyalty to the company.

52.     In December 2012, Kandalepas helped his best friend open an online brokerage account at TD Ameritrade.

53.     The best friend gave Kandalepas online access to this brokerage account.

54.     The best friend also linked his brokerage account to a new checking account that he opened in his own name.  The best friend gave Kandalepas access to this checking account. Kandalepas had the ATM card and online access to the best friend's checking account.

55.     The periodic brokerage and bank account statements and other bank account documents for these new accounts were sent directly to Wellness' office in Illinois.

56.     In or around December 2012, Kandalepas began day-trading Wellness stock through this friend's brokerage account.

57.      Specifically, Kandalepas logged into his friend's online brokerage account, bought and sold Wellness stock, transferred the sale proceeds to his friend's checking account, and pocketed trading profits via ATM withdrawals, wire transfers, or writing checks payable to himself.

58.     Kandalepas executed over 1,300 trades of Wellness stock in his best friend's account over the course of 31 months.  He often entered multiple buy and sell orders for Wellness stock in a single day.

59.     During November and December of 2013, a substantial portion of the 740,000 Wellness shares that Kandalepas caused Wellness to issue to his best friend was deposited into the online brokerage account.   Kandalepas liquidated most or all of these shares between the time of deposit and June 2015.  The sale proceeds were pure profit, since those shares had been issued at $0.001 per share, or $740.

60.     From December 2013 through June 2015, Kandalepas transferred approximately $165,000 in trading profits from his friend's online brokerage account to his friend's checking account.  Approximately $136,000 of these funds were subsequently transferred to Kandalepas or used for Kandalepas' benefit.

61.     Kandalepas profited through these sales during the period when Wellness had false and misleading Forms 10-K and 10-Q filed with the SEC.

**D.**     **Kandalepas Manipulates the Market for Wellness Stock**

62.     Kandalepas also used his access to his best friend's brokerage account to manipulate the market for Wellness stock.  Kandalepas frequently purchased and sold Wellness stock in his best friend's account to artificially prop up Wellness' stock price.

63.     Kandalepas accomplished this by placing frequent small orders to purchase Wellness stock at or above the current offer price in order to increase the last traded price of the stock throughout the day or at the end of the day.  These small trades had no justifiable economic purpose, especially in light of Kandalepas' vast holdings of Wellness stock and the transaction costs that were incurred to execute these trades.

64.     Kandalepas pushed to keep Wellness' stock price up to attract new investments in Wellness during periods when Wellness was offering stock through private placements. Kandalepas also propped up the stock price to increase Wellness stock's value as currency for acquisitions made by Wellness.

65.     One method that Kandalepas used to protect Wellness' stock price against selling pressure was to trade very close to the market closing time in order to affect Wellness' closing share price.

66.     For example, on March 6, 2013, Kandalepas executed a trade to buy 200 shares of Wellness within the last ten minutes before market close, resulting in a 5% price increase from $0.61 to $0.64. This trade constituted a $128 "investment" in Wellness and had an inconsequential effect on the number of shares Kandalepas held. Kandalepas owned more than 3 million shares at the time. Kandalepas' only purpose in making this trade was to increase Wellness' stock price.

67.     As another example, on November 14, 2014, Kandalepas executed a trade to buy 500 shares of Wellness within the last minute of the trading day and drove the price up 20% from $0.10 to $0.12. On May 4, 2015, Kandalepas executed a trade to buy 300 shares within the last five seconds of the trading day and raised the stock price by nearly 4% from $0.27 to $0.28.

68.     In each of these examples, Kandalepas' trade was the last trade of the day and his trading accounted for 100% of the trading volume in the last ten minutes of the day. From December 2012 through June 2015, on at least 50 occasions, Kandalepas captured the last trade of the day less than 5 minutes before the end of the trading day.

69.     In addition to his marking-the-close trading, Kandalepas frequently entered trades to purchase small amounts of Wellness stock (*e.g.*, 200, 500 or 1,000 shares) in an effort to stabilize the stock price. The trading records show dozens of small trades of Wellness stock which had no apparent economic purpose, particularly given that Kandalepas owned more than 3 million shares.

70.     Kandalepas made these small trades in order to increase trading activity and volume, and to increase or stabilize the stock price.

71.     On numerous occasions from 2012 to mid-2015, Kandalepas also directed the original 2010 investors and other shareholders to "support" the price of Wellness stock by buying shares in the open market.

72.     For example, in mid-August 2012, Kandalepas sent an email to twelve individuals, including investors and board members, asking them for "help in our effort to stop the daily deterioration of our stock price – and reverse its course."   In that email, Kandalepas implored the Wellness shareholders to "combat the manipulators" by "energiz[ing] buying" and asked them to "team up and bid higher than their present bids."

73.     Sometimes, Kandalepas' request for stock support would coincide with the issuance of press releases by Wellness.  For example, in early August 2012, Wellness issued a press release announcing the acquisition of a subsidiary.  A few hours afterwards, Kandalepas sent an email to seven individuals telling them that "we need stock performance today desperately" and attaching a copy of the press release.  In that same email, Kandalepas warned that there would be "severe problems" if "we don't perform with this announcement."

74.     Kandalepas contacted Mushlin, a major Wellness shareholder, frequently to ask him to help prop up Wellness' stock price.  Kandalepas instructed Mushlin to buy Wellness stock "at the offer" in order to boost or support Wellness' stock price.  Kandalepas and Mushlin often traded in tandem to boost the stock price and generate volume.

75.     Kandalepas never disclosed the secret trading to shareholders, and his secret trading caused Wellness to misstate Kandalepas' beneficial ownership of Wellness stock in its Forms 10-K.  Wellness' Forms 10-K for 2013, 2014, and 2015 did not include the shares in Kandalepas' friend's account in Kandalepas' beneficial ownership totals, even though Kandalepas had seized control over those shares and profited from their eventual sale.  The Forms 10-K misleadingly showed that Kandalepas received a substantial number of shares when Wellness was formed in 2010 and never sold any of those shares, consistent with what he frequently told shareholders.  In fact, Kandalepas was day trading Wellness stock and profiting from selling his best friend's shares.

**E.**     **Wellness and Kandalepas Issued False and Misleading Press Releases**

76.     In 2015, Kandalepas also tried to induce others to invest in Wellness by issuing false and misleading press releases touting non-existent sales of medical devices by Wellness' subsidiary Psoria-Shield Inc. ("PSI").

77.     On October 1, 2015, Wellness issued a press release touting that Wellness was shipping a product, the PL-1000 medical device, to multiple major cities in the United States. The release discussed the primary sales channels and selling partners for the PL-1000, including both domestic and international sales channels.

78.     This press release was false and misleading. The "shipments" that were touted in the press release were primarily to potential buyers to allow them to test the product or to distributors for potential selling. The touted shipments were not made to fulfill purchases and at the time Wellness had not sold a single unit. In fact, Wellness could not legally sell any PL-1000s because PSI's manufacturing registration with the FDA had expired in October 2013. Without this registration, PSI was prohibited from manufacturing or selling its medical device, and the device could not legally be used on patients. Kandalepas was made aware of the registration deficiency nine days before this press release was issued.

79.     Kandalepas reviewed and approved the October 1, 2015 press release before it was issued and was quoted in the release hailing "this major milestone."

80.     Nearly two months later, on November 24, 2015, Wellness issued another press release touting additional shipments of the PL-1000 to new cities. According to the release, "[r]evenue for the earlier shipments reported on October 1, 2015 will be realized in the pending quarter, ending December 31, 2015. Revenue for the present shipments will be partially realized in December 2015 and partially in January 2016."

14

81. This release was false and misleading. As of the time of this release, Wellness had still not sold a single PL-1000, there were no sales orders associated with any of the product shipments, and PSI's FDA registration was still expired.

82. Kandalepas reviewed and approved the November 24, 2015 press release knowing that there had not been any sales.

83. Wellness recognized no revenue from medical device sales from October 1, 2015 through December 31, 2015.

**F.** **Wellness, Through Kandalepas, Retained Mushlin to Identify and Solicit Investors**

84. Beginning around 2012, Wellness, through Kandalepas, retained Mushlin and/or his business Equinox to identify potential investors and sources of funding and to solicit them to invest in Wellness through private placements. Mushlin was not associated with a registered broker-dealer, and Equinox was not registered as a broker-dealer.

85. Mushlin solicited potential investors in Wellness by calling individuals who previously had made investments in other issuers based on his recommendations.

86. Mushlin solicited potential investors in Wellness by sending unsolicited emails to his contacts, often with promotional materials attached.

87. Mushlin solicited potential investors in Wellness by meeting with potential investors or their agents.

88. Mushlin also solicited registered representatives that managed discretionary accounts to encourage them to buy Wellness stock for their customers.

89. Mushlin served as an intermediary between his investor contacts and Wellness at key points of the securities transactions and took numerous steps to facilitate those transactions.

15

90.     In exchange for his fundraising efforts, Kandalepas caused Wellness to pay Mushlin approximately 10% of the total amount of funds he raised.

91.     For example, in 2013, Mushlin raised over $1,300,000 for Wellness from over 25 investors.  Wellness paid him $156,950.

92.     Wellness' accounting records characterized Mushlin's cash payments as "finder's fees" and "consulting fees."

93.     In 2015, Kandalepas caused Wellness to pay Mushlin's company an additional $35,975 for Mushlin's efforts in soliciting and securing investments for Wellness.

94.     In total, Wellness paid Mushlin $192,925 for raising approximately $1.5 million from over 30 investors between March 2013 and April 2015.

95.     In April 2017, Kandalepas again caused Wellness to pay Mushlin for soliciting investments.  That month, one of Mushlin's contacts invested $400,000 in a private placement offered by Wellness.

96.     Around this same time, Wellness paid Mushlin $40,000, 10% of the investment amount purportedly pursuant to a consulting agreement entered into in late March or early April 2017.  Kandalepas also transferred 100,000 shares of Wellness stock to Mushlin as a "gift."

**G.     Related Actions**

97.     Mushlin settled SEC administrative charges against him by consenting to the entry of an Order Instituting Administrative and Cease-and Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933, Sections 15(b) and 21C of the Securities Exchange Act of 1934, and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, without admitting or denying the findings.  The violations included Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

98.     Wellness settled SEC administrative charges against it by consenting to the entry of an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order, without admitting or denying the findings.  The violations included Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT I

### Violations of Section 17(a)(1) of the Securities Act

99.     Paragraphs 1 through 98 are realleged and incorporated by reference as though fully set forth herein.

100.     By engaging in the conduct described above, Defendant Kandalepas, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, had employed devices, schemes and artifices to defraud.

101.     Defendant Kandalepas acted with *scienter* in that he knowingly or recklessly made the untrue statements and omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

102.     By reason of the foregoing, Defendant Kandalepas violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Sections 17(a)(2) of the Securities Act

103.     Paragraphs 1through 98 are realleged and incorporated by reference as though fully set forth herein.

104.     By engaging in the conduct described above, Defendant Kandalepas, in the offer and sale of securities, by the use of the means and instruments of transportation or communication

in interstate commerce or by use of the mails, directly or indirectly, has obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

105.    By reason of the foregoing, Defendant Kandalepas violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III

### Violations of 17(a)(3) of the Securities Act

106.    Paragraphs 1 through 98 are realleged and incorporated by reference as though fully set forth herein.

107.    By engaging in the conduct described above, Defendant Kandalepas, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, has engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

108.    By reason of the foregoing, Defendant Kandalepas violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT IV

### Violations of 10(b) of the Exchange Act
### and Exchange Act Rule 10b-5

109.    Paragraphs 1through 98 are realleged and incorporated by reference as though fully set forth herein.

110.    By engaging in the conduct described above, Defendant Kandalepas, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate

commerce and by the use of the mails, directly and indirectly: (a) used and employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon sellers and purchasers and prospective purchasers of securities.

111. Defendant Kandalepas acted with *scienter* in that he knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme described above.

112. By reason of the foregoing, Defendant Kandalepas violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

### COUNT V

### Aiding and Abetting Violations of Section 15(a) of the Exchange Act

113. Paragraphs 1 through 98 are realleged and incorporated by reference as though fully set forth herein.

114. As set forth herein, Mushlin made use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security without being registered in accordance with Section 15(a) of the Exchange Act.

115. By reason of the foregoing, Mushlin violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

116. Defendant Kandalepas aided and abetted Mushlin's violations of Section 15(a) of the Exchange Act. Defendant Kandalepas, knowingly or with the requisite scienter, provided

substantial assistance to Mushlin in effecting transactions in, or in inducing or attempting to induce the purchase or sale of, any security without being registered in accordance with Section 15(a) of the Exchange Act.

117.    By reason of the foregoing, Defendant Kandalepas aided and abetted Mushlin's violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## COUNT VI

### Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act

118.    Paragraphs 1 through 98 are realleged and incorporated by reference as though fully set forth herein.

119.    As set forth herein, Wellness, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

120.    By reason of the foregoing, Wellness violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

121.    Defendant Kandalepas aided and abetted Wellness' violations of Section 17(a)(2) of the Securities Act.  By engaging in the conduct described above, Defendant Kandalepas, knowingly or with the requisite scienter, provided substantial assistance to Wellness in obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

122.     By reason of the foregoing, Defendant Kandalepas aided and abetted Wellness'
violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendant Kandalepas committed the
violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendant Kandalepas
from, directly or indirectly, engaging in the transactions, acts, practices or courses of business
described above, or in conduct of similar purport and object, in violation of Section 17(a) of the
Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]
and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5] and from aiding and abetting violation of
Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] and Section 17(a)(2) of the Securities
Act [15 U.S.C. § 77q(a)(2)].

### III.

Enter an Order requiring Defendant Kandalepas to disgorge his ill-gotten gains received
as a result of the violations alleged in this Complaint, including prejudgment interest.

### IV.

With regard to Defendant Kandalepas' violative acts, practices and courses of business
set forth herein, issue an Order imposing upon Defendant Kandalepas appropriate civil penalties
pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the
Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Enter an Order pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] barring and prohibiting Defendant Kandalepas from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**VI.**

Enter an Order pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. §78u(d)(6)] prohibiting Defendant Kandalepas from participating in any offering of a penny stock including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock.

**VII.**

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other relief as this Court deems appropriate.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**


By: /s/ Doressia L. Hutton
Doressia L. Hutton (HuttonD@sec.gov)
John E. Birkenheier (BirkenheierJ@sec.gov)
Michelle Muñoz Durk (MunozdurkM@sec.gov)
Kevin A. Wisniewski (WisniewskiK@sec.gov)
175 West Jackson Boulevard, Suite 1450
Chicago, IL 60604-2615
(312) 353-7390
(312) 353-7398 (fax)

*Attorneys for Plaintiff the United States Securities
and Exchange Commission*