# EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | Case No: 1:18-cv-02637 |
| Plaintiff, | ) ) ) | Judge: Ronald A. Guzman |
| v. | ) ) ) | Magistrate Judge: Young B. Kim |
| ANDREW J. KANDALEPAS, | ) ) ) |  |
| Defendant. | ) ) ) |  |

**PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS
TO DEFENDANT ANDREW J. KANDALEPAS**

Plaintiff, the U.S. Securities and Exchange Commission ("Plaintiff" or "SEC"), pursuant to Rule 36 of the Federal Rules of Civil Procedure and the Minute Order entered on June 21, 2018 (Docket No. 17), requests that Defendant Andrew J. Kandalepas respond in writing to the following requests for admissions by August 6, 2018 to undersigned counsel.

**Definitions and Instructions**

A.   The terms in the SEC's requests should be given their natural meaning and are intended to require a complete disclosure of the facts of this case. If in doubt, you should interpret the SEC's discovery requests as seeking a complete disclosure of all relevant information described in the request. Please contact counsel for the SEC if you have questions about the scope or meaning of any of the requests.

1

B. "SEC" means the plaintiff in this action, the United States Securities and Exchange Commission.

C. "You" or "your" means Andrew J. Kandalepas, as well as his agents, attorneys, entities acting under his control or direction, and those persons authorized to act on his behalf.

D. Matthew Mushlin" means Matthew T. Mushlin, as well as his agents, attorneys, entities acting under his control or direction, including but not limited to Equinox One Consulting LLC, and those persons authorized to act on his behalf.

E. "Tony Li" means Tony Zhicong Li, as well as his agents, attorneys, entities acting under her control or direction, and those persons authorized to act on his behalf.

F. "Wellness" means Wellness Center USA, Inc. and its parents, predecessors, successors, subsidiaries, related corporations, partnerships, joint ventures, professional associations, joint ventures, affiliates, principals, officers, directors, partners, associates, employees, agents, independent contractors, and persons acting on its behalf, as well as any aliases, code names, or trade or business names used by any of the foregoing.

G. "Li and Company" means Li and Company, PC and its parents, predecessors, successors, subsidiaries, related corporations, partnerships, professional associations, affiliates, principals, officers, directors, partners, associates, employees, agents, independent contractors, and persons acting on its behalf, as well as any aliases, code names, or trade or business names used by any of the foregoing.

H. "Investor" refers to any person or entity that agreed to give money or other assets to you or Wellness for the purpose of investment or investment management.

I.  The terms "and" and "or" shall be construed either disjunctively or conjunctively whenever appropriate in order to bring within the scope of these requests any documents that might otherwise be considered beyond their scope.

J.  You must respond to these requests in writing by August 6, 2018. Your failure to timely respond to any request may result in that matter being deemed admitted.

K.  Any matters admitted are deemed conclusively established unless the court, on motion, permits the admission to be withdrawn.

L.  In response to each request, please state whether you admit, deny, or lack sufficient information to admit or deny, the matter asserted. If you cannot truthfully admit or deny any matter, you must state in detail why you are unable to do so.

M.  If you deny only part of a matter or wish to qualify an answer, you must specify the part admitted and qualify or deny the rest.

N.  You must clearly state the grounds for objecting to any request.

O.  If you assert a privilege as the basis for not responding to a request, please clearly state the type of privilege you are asserting and the basis for asserting the privilege.

P.  Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, all responses to discovery requests must be reasonably and timely supplemented throughout this litigation.

## REQUEST FOR ADMISSIONS

1.  Since the formation of Wellness in 2010 through December 2017 you had sole control over Wellness' business functions.

2.  When Wellness was formed in 2010, you appointed yourself as Chief Executive Officer.

3.  When Wellness was formed in 2010, you appointed yourself as Chief Financial Officer.

4. When Wellness was formed in 2010, you appointed yourself as President.

5. When Wellness was formed in 2010, you appointed yourself as Chairman of Wellness' Board of Directors.

6. Since the formation of Wellness in 2010 through December 2017, you were the sole officer of Wellness.

7. Since the formation of Wellness in 2010 through April 2018, you were Chairman of Wellness' Board of Directors.

8. Since the formation of Wellness in 2010 through December 2017, Wellness' operations were primarily funded through sales of common stock and the exercise of warrants.

9. Since 2011 through December 2017, the sales of stock and the exercise of warrants have raised approximately $19.159 million.

10. Since the formation of Wellness in 2010 through December 2017, you were responsible for Wellness' financial reporting, including the issuance of periodic reports filed with the SEC.

11. Since the formation of Wellness in 2010 through December 2017, you had sole control over Wellness' bank account(s).

12. Since the formation of Wellness in 2010 through December 2017, you had sole control over Wellness' bookkeeping.

13. By the end of Wellness' fiscal year 2012, you had been repaid approximately $200,000 in loans you had made to Wellness.

14. After repayment of the approximately $200,000 in loans you had made to Wellness, you continued to withdraw money from Wellness' bank account.

15. In February 2013, Wellness' bookkeeper notified you that during the first quarter of fiscal year 2013 you had taken out approximately $68,433 beyond what you had loaned to Wellness.

16. After you were notified that you had withdrawn more than you had loaned to Wellness, you decided, without authorization from Wellness' Board of Directors, that you would receive a $200,000 annual salary.

17. You and Wellness did not enter into an employment agreement regarding your $200,000 annual salary.

18. From the formation of Wellness through 2017, you never had an employment agreement with Wellness.

19. Wellness did not disclose that you started receiving a salary in 2013.

20. During Wellness' first and second quarter 2013, you took $100,000 in "salary."

21. During Wellness' first and second quarter 2013, you made oral representations to investors and potential investors that you were not receiving a salary.

22. For Wellness' first and second quarter 2013, the only affirmative disclosure about your compensation stated that you were not receiving any salary.

23. During Wellness' first and second quarter 2013, you made oral representations to Wellness' directors that you were not receiving a salary.

24. Throughout 2013, you withdrew inconsistent amounts rather than consistent salary payments.

25. Throughout 2013, you did not limit the amount of your withdrawals from Wellness' bank account to your $200,000 "salary."

5

26. By the end of Wellness' fiscal year 2013, you had withdrawn over $457,000 from Wellness: $200,000 in the form of salary and approximately $257,085 in addition to the $200,000 "salary."

27. In its 2013 Forms 10-Q, Wellness did not disclose that you withdrew approximately $257,085 in addition to the $200,000 "salary."

28. You considered this approximately $257,085 as compensation for previous years when you did not receive a salary.

29. Wellness' 2013 Forms 10-Q included your withdrawals in excess of your $50,000 per quarter "salary" in a balance sheet line item entitled "prepayments and other current assets."

30. There was no disclosure in Wellness' 2013 Forms 10-Q that the line item entitled "prepayments and other current assets" represented withdrawals of corporate funds by you.

31. In January 2014, when the Wellness fiscal year 2013 audit was being performed, Wellness' auditor spoke with you about the approximately $257,085 that you had withdrawn from Wellness above your $200,000 salary throughout 2013.

32. In January 2014, you told Wellness' auditor that you considered the approximately $257,085 in withdrawals to be "back pay" for previous years' service for which you were not compensated.

33. In January 2014, Wellness' auditor advised you that you could not take "back pay" since Wellness had not accrued salary for you in prior periods.

34. In January 2014, Wellness' auditor advised you that the approximately $257,085 in withdrawals would need to be recognized as compensation in 2013 or you would need to pay back the money, either immediately or pursuant to a promissory note.

6

35. You did not want to recognize the approximately $257,085 as additional compensation.

36. Between midnight and 3:00 a.m. on January 14, 2014, you signed a promissory note agreeing to repay Wellness $250,000 plus interest (the "Promissory Note").

37. September 30, 2013 was the last day of Wellness' 2013 fiscal year.

38. Wellness' 2013 Form 10-K was signed by you on January 14, 2014.

39. In Wellness' 2013 Form 10-K, the approximately $257,085 in withdrawals were reclassified on Wellness' balance sheet from prepaid expenses to a note receivable.

40. Wellness 2013 Form 10-K attached a copy of the Promissory Note as an exhibit.

41. When you signed the Promissory Note on January 14, 2014, you were delinquent on your mortgage.

42. When you signed the Promissory Note on January 14, 2014, you owed thousands of dollars in credit card debt.

43. When you signed the Promissory Note on January 14, 2014, you had less than $10,000 cash in your bank accounts.

44. During 2013 through 2015, Wellness conducted offerings of its common stock through private placements.

45. In 2010, Wellness issued more than 3.6 million shares of common stock to you and options to purchase another 1.6 million shares.

46. You had Wellness issue over 11 million shares to members of your family, close friends, and business associates at the price of $0.001 per share.

47. You had Wellness issue over 740,000 shares to Nikolaos Sguros.

48. Those shares to Nikolas Sguros were issued at $0.001 per share, or $740.

7

49. In December 2012, you helped Nikolaos Sguros open an online brokerage account at TD Ameritrade ("online brokerage account").

50. Nikolaos Sguros gave you online access to this brokerage account at TD Ameritrade.

51. In or around December 2012, you began trading Wellness stock through Nikolaos Sguros' online brokerage account.

52. You logged into Nikolaos Sguros' online brokerage account.

53. You bought and sold Wellness stock in Nikolaos Sguros' online brokerage account.

54. You transferred the sale proceeds from the sale of Wellness stock to a checking account in the name of Nikolaos Sguros.

55. You obtained these sale proceeds from the sale of Wellness stock via ATM withdrawals, wire transfers, or writing checks payable to yourself from the checking account in the name of Nikolaos Sguros.

56. You executed over 1,300 trades of Wellness stock in Nikolaos Sguros' online brokerage account over the course of 31 months.

57. The Promissory Note was dated September 30, 2013.

58. In Nikolaos Sguros' online brokerage account, you entered multiple buy and sell orders for Wellness stock in a single day.

59. During November and December of 2013, a substantial portion of the 740,000 Wellness shares that you caused Wellness to issue to Nikolas Sguros was deposited into Nikolaos Sguros' online brokerage account.

8

60. You liquidated most or all of these 740,000 shares between the time of deposit and June 2015.

61. From December 2013 through June 2015, you transferred approximately $165,000 in trading profits from Nikolaos Sguros' online brokerage account to Nikolaos Sguros' checking account.

62. You then transferred approximately $136,000 of the $165,000 in trading profits from Nikolaos Sguros' checking account to yourself or used it for your benefit.

63. You purchased and sold Wellness stock in Nikolaos Sguros' online brokerage account to prop up Wellness' stock price.

64. In Nikolaos Sguros' online brokerage account, you placed orders to purchase Wellness stock at or above the current offer price.

65. In Nikolaos Sguros' online brokerage account, you frequently placed orders to purchase Wellness stock at or above the current offer price.

66. You tried to keep Wellness' stock price up during periods when Wellness was offering stock through private placements.

67. You traded Wellness stock very close to the market closing time.

68. On March 6, 2013, you executed a trade to buy 200 shares of Wellness stock within the last ten minutes before market closing time.

69. On November 14, 2014, you executed a trade to buy 500 shares of Wellness stock within the last minute before market closing time.

70. On May 4, 2015, you executed a trade to buy 300 shares of Wellness stock within the last five seconds before market closing time.

71. From December 2012 through June 2015, on at least 50 occasions, you captured the last trade of the day in Wellness stock less than 5 minutes before the end of the trading day.

72. During 2012 through 2015, you entered trades to purchase amounts of Wellness stock such as 200, 500, or 1,000 shares.

73. During 2012 through 2015, you frequently entered trades to purchase amounts of Wellness stock such as 200, 500 or 1,000 shares.

74. You told investors and prospective investors that you never sold any of the Wellness shares you obtained when the company was formed.

75. During 2012 through 2015, you made trades in Wellness stock in order to increase trading activity.

76. During 2012 through 2015, you made trades in Wellness stock in order to increase trading volume.

77. During 2012 through 2015, you made trades in Wellness stock in order to increase the stock price.

78. During 2012 through 2015, you made trades in Wellness stock in order to stabilize the stock price.

79. On August 17, 2012, you sent an email to twelve individuals, including investors and board members, stating "I am coming to you for help in our effort to stop the daily deterioration of our stock price – and reverse its course."

80. In that August 17, 2012 email, you told Wellness shareholders "We must team up and bid higher than their present bids."

81. On August 8, 2012, Wellness issued a press release announcing the acquisition of CNS-Wellness LLC.

82. On August 8, 2012, after Wellness issued the press release, you sent an email to seven individuals attaching a copy of the press release and stating that "We need stock performance today desperately" and "If we don't perform with this announcement we will have severe problems" and "There are only 2,000 shares traded thus far today."

83. You instructed Mushlin to buy Wellness stock "at the offer."

84. You and Mushlin often traded in tandem.

85. You never disclosed your trading in Wellness stock to shareholders.

86. Wellness' Forms 10-K for 2013, 2014, and 2015 did not include the shares in Nikolaos Sguros' online brokerage account in your beneficial ownership totals.

87. Wellness' Forms 10-K for 2013, 2014, and 2015 showed that you received over 3,660,000 shares when Wellness was formed in 2010 and never sold any of those shares.

88. Wellness' subsidiary Psoria-Shield Inc. had a medical device product named the Psoria-Light (PL-1000).

89. On October 1, 2015, Wellness issued a press release stating that the Psoria-Light (PL-1000) medical device was being shipped to New York, Miami, Cleveland, and Chicago.

90. As of October 1, 2015, no Psoria-Lights (PL-1000s) had been sold.

91. Psoria-Shield Inc.'s manufacturing registration with the FDA had expired in October 2013.

92. Because Psoria-Shield Inc.'s manufacturing registration with the FDA had expired in October 2013, Psoria-Shield was prohibited from manufacturing its medical device.

93. Because Psoria-Shield Inc.'s manufacturing registration with the FDA had expired in October 2013, Psoria-Shield was prohibited from selling its medical device.

94. Approximately nine days before the October 1, 2015 press release was issued, you were made aware that Psoria-Shield Inc.'s manufacturing registration had expired.

95. On November 24, 2015, Wellness issued a press release about shipments of the Psoria-Light (PL-1000) to the additional locations of Boston, Philadelphia, Houston, Minnesota, and North Carolina.

96. As of November 24, 2015, no Psoria-Lights (PL-1000s) had been sold.

97. As of November 24, 2015, PSI's manufacturing registration with the FDA was still expired.

98. In February 2013, Wellness' bylaws required the Board of Directors to authorize all officer compensation.

99. Beginning around 2012, Wellness, through you, retained Mushlin and/or his business Equinox to identify potential investors and sources of funding and to solicit them to invest in Wellness through private placements.

100. For his fundraising efforts, you caused Wellness to pay Mushlin approximately 10% of the total amount of funds Mushlin raised.

101. In 2013, Mushlin raised over $1,300,000 for Wellness from over 25 investors, and Wellness paid Mushlin $156,950.

102. Wellness paid Mushlin $192,925 for raising approximately $1.5 million from over 30 investors between March 2013 and April 2015.

103. In April 2017, one of the people Mushlin solicited invested $400,000 in a private placement offered by Wellness.

104. In April 2017, you caused Wellness to pay Mushlin for soliciting investments.

Dated: July 6, 2018 **UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

/s/Doressia L. Hutton
Doressia L. Hutton (HuttonD@sec.gov)
John E. Birkenheier (BirkenheierJ@sec.gov)
Michelle Muñoz Durk MunozdurkM@sec.gov)
Kevin A. Wisniewski (WisniewskiK@sec.gov)
175 West Jackson Boulevard, Suite 1450
Chicago, IL 60604-2615
(312) 353-7390
(312) 353-7398 (fax)

**CERTIFICATE OF SERVICE**

I certify that on July 6, 2018, I served a copy of the foregoing **PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS TO DEFENDANT ANDREW J. KANDALEPAS** by electronic mail delivery on

James L. Kopecky (jkopecky@ksrpc.com)
Howard Rosenburg (hrosenburg@ksrpc.com)
Kopecky Schumacher Rosenburg PC
120 N. LaSalle Street, Suite 2000
Chicago, IL  60602
312-380-6552
*Attorneys for Defendant Andrew J.  Kandalepas*

.

By: ***/s/Doressia L. Hutton***